The next matter is number 221047 and number 221182. United States, ex rel. Anthony Nargol, et al. v. DePuy Orthopaedics, Incorporated, et al. At this time, would Attorney Morrison please introduce himself on the record to begin? Thank you, Your Honor. May it please the Court, Ross Morrison for plaintiff's appellants. Please. I'd like to possibly reserve five minutes for rebuttal, if that's okay. Okay. The Court should reverse the judgment of the District Court because it abused its discretion in dismissing the second amended complaint. The District Court imposed a test that relators needed to show that the specific information at issue, which was the diameter of the 36 millimeter pinnacle head device, that's the subject information. The only information that's at issue in this case was not confidential. There was some public source for that information. So it was an objective test. Either the information was confidential at the time the relators filed the second amended complaint in May of 2015 or it was not confidential, it was public. If the relators could meet that test, they would not have been in violation of any court order and the court would not have dismissed the case. The relators did, in fact, introduce evidence in the District Court, more than sufficient evidence that showed that that information, the subject information, was confidential in May 2015 when they filed the second amended complaint. The District Court either ignored that evidence or did not adequately address it. Did you mean to say it was public? I'm sorry, yes, it was public. I'm sorry if I misspoke because that would be bad. The documents that they did introduce demonstrated that the information was, in fact, public in May of 2015 when they filed the second amended complaint. So the District Court therefore erred and it clearly abuses discretion in finding, in rejecting that evidence and finding that the subject information was confidential in May of 2015. The District Court's test, as set forth in the opinion granting. You want to just get right to what is the record support for the idea that the evidence that you say needed to be public was public at the relevant time? Sure. There are two, at least two, no, there's more than two, but there are multiple sources for the public, the public source of the subject information. There are two trial exhibits that were introduced in the multi-district litigation underlying the litigation about this pinnacle head device, the pinnacle device that were introduced in May of 2015, Exhibit 467 and Exhibit 433. Exhibit 467, which was introduced, contains the subject information, contains the diameter of the head in inches to five decimal places. So it's a more precise version, actually, of the subject information, which is to four decimal places. That in and of itself raises the question of why a more precise version of a number, if that's not confidential, why was the less precise version of that number somehow confidential? The district court. Counsel, can you explain something to me? The relators, because of their role as expert witnesses, they received information from attorneys involved in the litigation that dealt with both the measurements of the head and the liner, if you will. Is that correct? Did they receive, I mean, diagrams, engineering diagrams, which I guess would be the most reliable source of the specific measurements. Did they receive all of that in, I guess, 2013 from lawyers involved in the process? They received the information, protected information, certainly, as their compassionate expert. And when getting that information, they signed a confidentiality agreement indicating that they would not use that information for their own purposes. Is that correct? They would not use those documents or the information in those documents. That was confidential. Correct. When they filed the earlier complaint, they apparently, at that point, realized they had violated the agreement. Is that correct? Yes. They self-reported certain violations of that protective order to the judge, one of the judges in the multidistrict litigation, Judge Katz. And that was in 2013. So when they refiled the complaint in 2015, weren't they still using some of that same information, which they had acknowledged in 2013 that they should not have used? Well, I think, Your Honor, what the district court found and what we have not disputed is that they had access to the diagram for the head in 2015. However, the issue is, as posited by the district court. So in 2015, did they get that information from some other source, a public source, which would thereby release them from the confidentiality agreement that they had signed in 2013? Because now, unlike in 2013, there was a public source for that same information. Is that their position? The position is, Your Honor, that it doesn't actually matter where they got it. And the district court said that. It said if there was a public source for that information in 2015, at the time of the filing of the Second Amendment complaint, then it does not matter what, in fact, document they used or did not use, whether they used the public source or didn't use the public source, to plead the allegations in that document, in that pleading. Well, they had to identify what that public source was, right? They couldn't just say we got it from a public source. They had to actually identify that public source. We had to identify a public source, not where they actually got it from. Because what the district court did not do was require the relators to address or trace the source of the allegations concerning the subject information. What they were required to do was show that in 2015, it was, in fact, a public source. It's an objective test. Either there is a public source or there's not. Whether the relators used it or didn't use it, 10 years ago, as they posited to the district court, there was. But I thought, and I agree, the facts here are very complicated. It's very difficult to get one's head around it. My sense is that the district court concluded that you never identified the public source that you're relying upon, so I'm going to draw the adverse inference that you're still relying on that same confidential information that infected that 2013 complaint. And so in that sense, you're still in violation. Isn't that what the district court concluded? Well, the district court found that we had not identified a public source. That was incorrect, and that was an abuse of discretion. Okay, why is that incorrect? Because, A, a public source did exist in these two trials in May of 2015 when they filed the amended complaint, and therefore the information was not confidential. As long as the information was no longer confidential, they were free to use that information. When you say the information, that's a kind of general term. The subject information. What? The subject information. There's only one information I'd issued in this case, which is the diameter of the head of this pinnacle device. Well, I thought there was questions about deductions that one could make from that fact. Is that wrong? There were. One of the exhibits, well, the information, the precise information that we're talking about is the diameter of the head in inches expressed to four decimal places. That is the number, of course, is allegedly confidential. That, however, that information, though, could be, was directly stated in one of the trial exhibits, in exhibit 433, that exact number was stated. And in 467. And that was identified to the district court. It was identified multiple times to the district court, as was another exhibit, exhibit 467, which had the number to a more precise version of the number to five decimal places in inches. And you could easily derive the actual number they were using, the less precise version of that number, from that document, given what was represented about. But you're saying even without the derivation, the number itself that was derived, and that was supposedly the confidential thing, was itself public in the filed public document? Correct. And both the district court and Dupuy admitted that that exhibit contains the subject information. When did you first identify that public information to the district court? Sure. We identified it multiple times. That exhibit was identified initially in opposition to Dupuy's motion to dismiss. And it was also identified in opposition to their, in that motion to dismiss, the court originally denied. So that, was that in, are we, are you in 2021? Yes. Okay. In October of 2021? I believe it predated that. I believe it would have been earlier in the summer or spring of that year. They were also subsequently identified in opposition to Dupuy's motion for reconsideration, which, of course, the court, you know, reversed itself and granted the motion and dismissed the complaints. In addition, the exhibit 467, which also contains, as I said, sufficient information to be able to derive the subject information, that was identified to the district court at least four times, including in both of those motions that I just mentioned, the opposition to the motion to amend, the motion to dismiss, and the opposition to Dupuy's motion for reconsideration. But it was also previously identified in February of 2021 in a motion for an extension of time that the relators filed. Can I just, and maybe I just need this clarified, but I'm looking at a selection from your motion for reconsideration in September of 2021, and there's a footnote there that says you haven't located the Pinnacle Heads engineering diagram in the public domain. Is that right? Correct. The diagram itself was not, is not the source, the public source of that information. But those two exhibits, the trial exhibits that I mentioned, are the primary sources for the public versions. On the same line of inquiry, what do you make of the court's conclusion that relators have represented that, quote, engineering drawings are the most authoritative sources of a device's precise dimensions? They are the most authoritative, but there are other sources. In fact, the two trials exhibits that I referenced, those were submitted to the FDA by Dupuy as part of its application for approval of the device. They were introduced, they were used by the Dupuy expert in the multi-district litigation, those exhibits. So they were authoritative sources of that information. You could tell, or anyone could tell, not only our clients, but anyone could tell from that, those exhibits. And with respect to the sentence from the court, the court says, because relators have provided limited details to fill out the narrative, this is with respect to the Pinnacle Head measurement, the court must supply details on its own, including through the use of adverse inferences. You're just saying that the court is just flatly wrong there because you did provide details to fill out the narrative of the Pinnacle Head measurements? We did. And that's the, in your view, that's the reference to the filing in the multi-district litigation that includes the precise measurements? Yes, Your Honor. The two exhibits that were filed in open court. So just so I'm understanding, the two points you are making are, one, the court was wrong to think that the engineering drawings are relevant because what's relevant is the head measurements, period. That information, the head measurement is the relevant information. The question was whether that was correct or not. Are you disagreeing with me or agreeing with me? I'm agreeing with you, and I'm explaining a little bit further, I think, as to why. Because it's an objective test. The actual number is the information. Therefore, the engineering documents are irrelevant? In that sense, yes, because the number was in other documents that used by the plea in the trial. Okay, and then with respect to whether you filled out the details for the court to meet your burden that it understood you bore, given the prior circumstances, your contention is, notwithstanding the court saying that you hadn't supplied those details, you actually had supplied them. Correct. That's the end of the case. That is the end of the case. In that case, although, as Your Honor references, as Judge Lopez said, it's complicated. In that sense, it's not complicated. The issue was whether the subject information, this head diameter, was public. What the relators did and the source of where they actually got that information does not matter. The adverse inference that this court imposed doesn't matter. What matters only was at the time that the second amending complaint was filed in May of 2015, was that information, the subject information, the diameter of the head, was that in some public source? It was publicly available. And it was because Dupuy had filed two trial exhibits with that information, either directly stating it or whether it could be ascertained from one of the exhibits. So subsequent to the entry of those trial exhibits, I think Dupuy was successful. I'm really asking about the timing of all this. They were successful in persuading the court to protect that information as proprietary, sort of after the fact, weren't they? It's unusual, I think, to be able to do that after the fact, that they were successful in doing that. But I gather that happened after you filed the second amended complaint. That's correct. So that really is not, because of the timing, it's not relevant to this issue here. Is that correct? That's correct. It's irrelevant. Their motion to seal, it was only exhibit 433, the one that contained the actual number. That was made in 2016, their application to seal. And it actually did not even include the page with the actual number. And that was in 2016, so it was irrelevant because the second amended complaint was filed in 2015. The other exhibit I referenced, 467, they never made a motion to seal that exhibit. And the only time they made any further efforts to seal information was in the context of the most recent case in 2021. Can I just ask something? This is a point of detail that shows my lack of knowledge of what we're talking about. There's a reference continually to dimensions and measurements in the plural, and you keep identifying a single number. So can you explain that discrepancy? Well, what happened was, I think, there is a single number that Dupuis uses to measure the head diameter. And that's the subject information. There are now, but what our clients did at different, and that was to use mathematical calculations to change that number, like from inches to millimeters, for instance. So there's other versions of the number that, you know, but the only issue ultimately is whether that original number, the diameter of the head in inches is public or not. Okay. Any further questions? Go ahead. Thank you. There's a reference, the district court refers to this report that was done by QQA. Yes. And they make the point, the court makes the point that that report where they, I guess, identify problems with the Dupuis product because of the frequency of non-conformities and things like that, that the district court says that that report was based on information that was given to the relators in November of 2013. And the court specifically refers to a head diameter, tolerance levels, that kind of thing. And when that information was given to QA, it was confidential because the relators had signed a document saying that they knew they were getting that information from the attorneys involved in the MDL litigation with an understanding that they were to keep it confidential. The court seems to be saying that that QA report, which was based on this confidential information, remains important in the filing of the second amended complaint. And so that confidentiality continues to taint the second amended complaint. Is that, as a factual matter, is the district court wrong in saying that that report continues to be important to the complaint that your clients filed in 2015? Yes, the district court is wrong because for the same reasons that I enunciated earlier, which is that the information that we're talking about here, the diameter of this head, was publicly available in these other two trial exhibits. And so whether, you know, the document itself that they had received in 2013, whether that was, there were parts of it that were confidential or not, you know, the issue is whether the information in it is confidential at that point. Because if the information is not confidential at the time of the filing of the second amended complaint, then there would be no violation of any prior court order. The issue, and each judge has said that, both the judges in the MDL, Judge Saylor in this case, whether the information, the subject information is confidential at the time they filed the complaint, whether there's a public source of that, other than the diagram, right, that would then make the district court have errored in abusing its discretion in dismissing the case. It's just an objective test. Just so I'm clear on that, you just, if the diagram was relied on and the diagram was not public, your contention is it's fine to rely on the diagram so long as the diagram caches out as showing the precise dimensions of the head if the dimensions of the head were public? I'm not sure what you meant by caches out, but essentially I think what you meant. As I understand it, I think the answer to your question is yes. So, in fact, they could include, on your view, the diagrams themselves in the complaint? Well, there may have been other information in the diagram that was confidential. The document itself was subject to a protective order, but the exact diameter, which is the only information we're talking about here. Why do you say, that's what I'm trying to figure out, why do you say that's the only information we're talking about here? Because that is what the plea claim was confidential and that we had, that was the basis for the district court's finding that we had violated court orders by putting that information in the second amendment complaint. Okay. And we didn't because it was public. Thank you. Thank you, counsel. At this time, if counsel for the appellees would please introduce himself on the record again. Good morning, your honors. My name is Adam Tarosky and I represent the appellees, the DePue defendants below. May it please the court. The dismissal of this case was a discretionary one of a 10-year-old case as a sanction for relators' accumulated missteps, plural. Their entire appeal and the entire argument you just heard relates to one misstep. And I want to address that misstep head on. But I also want to make sure the court is aware that Chief Magistrate Judge Paige Kelly carefully considered and chronicled in detail all of the other missteps in this case going all the way back to 2013. Judge Lipez correctly observed that at that time, relators provided in violation of MDL protective orders, confidential documents to their consulting expert, QA Consulting. That's the expert that helped them compose the allegations that saved this case the last time it was before this court, the non-conformance allegations. That's the basis on which this matter, which had previously been dismissed, was remanded. In 2014, they admitted to the court below that they'd used confidential information to plead their initial and first amended complaints. And in 2015, they made a similar admission to Judge Katz in the Northern District of Ohio that they'd committed explicit violations of his protective orders. The case well could have been dismissed then under Rule 41. But it was not. Because at that time, Judge Saylor fashioned a fairly intuitive and interesting remedy, which was to say, I will allow the relators to file a second amended complaint, but I'm also going to require them to swear under oath in the form of affidavits that that complaint doesn't continue to violate any protective orders. That's why the timing is so important. That's why unearthing trial exhibits in 2021 doesn't matter. Judge Saylor said it was their burden to know and to swear to the court under oath that they had a reasonable basis for saying their second amended complaint doesn't violate any court order. They weren't allowed to then subsequently investigate whether it did or not, which is precisely what happened in 2020 and 2021. They hadn't conducted the reasonable inquiry at the relevant time, and they had no evidentiary basis for swearing under oath to the court below that they hadn't violated any protective orders in filing their second amended complaint. As to the MDL exhibits themselves, Judge Kincaid from the Northern District of Texas considered the very positions that relators have argued in the case below, which is that because DePue introduced certain multi-page exhibits, these documents are over 500 pages at trial, without publishing the pages that have the subject information on them, allegedly have the subject information on them, that DePue waived any protection that had previously attached to those documents. Judge Kincaid rejected that argument. He said that's one factor I considered, but he said those documents are still subject to protective orders. Had the relators, appellants, done the reasonable inquiry they were required to do at the time, they would have known that. The documents they refer to are to this day branded subject to protective order. Protective orders they sign identify engineering drawings as the quintessential example of the type of document that's going to be covered by the protective order. Engineering drawings. So at the time in 2015, what they knew is as you said, Judge Barron, engineering drawings are the most authoritative source of the measurements at issue, measurements, the nominal diameter, but also the minimum and maximum diameter. There was a range in which these products could be manufactured. And for QA to determine whether they were defectively manufactured or not, they had to know that range, not just the single number. And it's that range that is very clearly reflected in the engineering drawings at issue. Can I just understand what the point of dispute between the two of you is? One point of dispute might be what measurements were or were not public. I don't hear you disputing that the diameter of the head was public at the relevant time. Correct? It's not going to hurt you to say yes. You don't have to say yes. You don't lose your case if you say yes. Why don't you keep asking your question? No, no. I don't conceive that, but I don't think it matters. Okay. Do you conceive there's Exhibit 467 in the multidistrict litigation? Yes, of course. Did that document include the diameter head to five decimals? It included the – so that's another point of factual debate that Judge Kelly herself actually weighed in on because it does not include the precise number that the relators provided to QA Consulting. It may provide the means of deriving that precise number. It includes how many decimal points on that number? It includes the diameter to five decimals. Okay. So you're in agreement on that point? Yes. Okay. They think the mere fact that that was public is itself enough to absolve them. You're saying they're wrong. Correct? Correct. Okay. One reason you could be saying they're wrong is because actually there needed to be other numbers beyond that to be public. Correct. Like the range. Correct. And you're saying that range is not itself public. Am I right? The range also appeared in that document. Okay. But not to the same number of decimal points as the range that they provided QA Consulting. Okay. So one dispute between the two of you has to do with what kind of numbers were actually public in the multidistrict litigation documents. Are you also saying that even if we were to conclude that those numbers were in those documents, all the numbers you say had to be there, they still lose because that's not really what's at stake in whether they violated the protective orders. Because if they actually relied on documents in preparing this, then that's problematic independent of those numbers being public. I am also saying that, and I would add one other thing, which is that there's lots of other accumulated missteps and violations. I want to put that aside for a second. Just on these first two points, as to the second point of dispute, does that dispute boil down to a dispute about how to interpret Judge Saylor's order? Does it boil down to a dispute about what Judge Kelly found? In other words, what document, what legal text am I supposed to look at to adjudicate that second dispute the two of you are having? I know where to look for the first. That's just I see what the numbers are, and I see what arguments you make about who's better, more convincing as to whether the numbers that are in dispute were or were not made public. But as to that other one, what is the legal document you're fighting about the interpretation of? There are two places to look. The first is Judge Saylor's order, what he ordered them to do in 2015 and what that meant, and I've already addressed that. But Judge Kelly also interpreted it for the last time. Interpreted his order. Judge Saylor's order. Okay. And what she said it meant was two things. She required the relators to trace the origin to tell her to be candid with the court and reveal their actual source for the information they provided to QA Consulting, and then to show that that source was public in 2015. But that I think what's a little bit ambiguous potentially is whether in saying that what she was demanding is that they articulate that first dispute. In other words, that those numbers be public. Or whether she was saying, no, I want to know that, in fact, the documents were produced without the taint of you relying on those things that even they are agreeing are confidential documents. And I think she wanted both. But she used the word and. Trace the origin and show it was public. And then the reason I can say that confidently is because she issues a second order sometime later where she says she wants relators to tell her to explain how they were able to determine the upper and lower tolerance levels for the pinnacle head to five decimal places exactly as set forth in the QA report. And I thought that's where they got into trouble because they were not able. As I understand, she expresses frustration that they were unable to explain how they came up with those numbers. In fact, they acknowledge some uncertainty themselves about how they arrived at those numbers. Is that not frustration is an understatement. Having lived through this in the trial court, they had at least four chances to simply answer the question whether it was relevant or not. How did they derive these numbers? And it's because they were unable to her satisfaction to explain how they arrived at those critical numbers. She drew the adverse inference that they probably came from documents that were not in the public domain, particularly these drawings, I guess, which everybody agrees was the best source. That's where they actually got the numbers from. Was that the chain of reasoning that she used? If I may respond. Oh, I'm sorry. I thought there was a red light. Yes, that is the chain of reasoning that she used. Before you finish that answer, can you just explain when you say numbers, what are the numbers you're referring to? The minimum, nominal, and maximum diameter. So not just the number that is to the fifth decimal point. Correct. You would also have to know what's called the tolerance range, so the plus or minus four-digit number that goes on either side. And that you could find on the documents, on the engineering plans? Correct. They're CAD drawings, and the way they're expressed is the five-digit number, and then there's a little symbol that means plus or minus, and then a four-decimal place number that gives you the error or whatever on either side. And that range, you say a range is in the multi-district litigation documents, but not as precise as the range that they claim they could derive just from the fifth decimal point dimension of the head. That's essentially correct. The range is expressed in tabular form. It's not sort of in, you know, computer drawing form. But yes, I mean, it does appear in that document. Sorry, go ahead. No, that's okay. I do want to spend my last three minutes on all of the other litigation missteps that amply support the discretion that Judge Kelly exercised under Rule 41. You can, but there's no indication that those alone are the basis for the order. Her order referred to accumulated missteps. Right, of which this was one. There's nothing you can tell from the order that without this one, she would have ordered this relief. I believe that's true. So even if you showed all the others, at a minimum, we'd have to vacate the order if this one didn't also stand. I'm not sure I agree with that. Was there something where she says she would have done it independent of this? No, but she includes all of the findings of all of the other violations. Including this one. In her written opinions. Including this one, sorry. And never says, I would do it without this one. She never says I would do it without this one. So on what basis could we affirm if we thought this one was wrong? Well, a court can affirm on any basis that's apparent from the record. But she has discretion whether to do it. And if we're affirming her exercise of discretion and she gives five reasons without saying I would do it if only four were there, typically we wouldn't affirm based on four if there was a fifth one that seemed significant. So I think you're reviewing for an abuse of discretion. And if you find ample basis for her ultimate discretionary decision. Wouldn't she have discretion to not do it? Agreed. So we're just reviewing her discretion. And here she told us how she exercised. You can do it if you want to go through the other ones. But I'm just saying it seems hard to me to say. I'll take the court's lead. I mean, I think at the very least I'll say that even after she made it crystal clear that these dimensions remain public today, there were two separate instances where relators filed them on the public docket. Where DePue had to make an emergency motion that was granted. And the judge in both instances said this just shows that they don't comprehend and are not going to comply with their orders. And she also said in her memo that this causes me to distrust or not trust, I think her words were, and find unreliable the representations that the relators continue to make to me. And not only does that call me to question the central allegations about the nonconformance based on the QA piece, but it also calls me to question whether there are other allegations in the second amended complaint that are tainted by this very same litigation misconduct. So I do think that's a basis, something the court can look at in the record below, in the opinions below, to find that Judge Kelly did not abuse her discretion in dismissing this case. Counsel, can you just distill for me your understanding of what public document the relators rely upon as the source of these critical measurements that you're talking about? Again, what is your understanding of the public document that they're relying upon? I think at the time that they swore to Judge Saylor that they weren't relying on confidential information, they did not have a public document that they were relying on. They didn't know about these trial exhibits. The best source for that, Your Honor, is the affidavit that one of the relators submitted. It was their fourth chance to answer the court's question, how did they actually derive these dimensions? And there are maybe ten different alternatives that are set forth in that affidavit, where he ultimately concludes, I don't remember. And it was their obligation not only to remember, but to know and to be able to show. And that's what really bothered the court here in deciding to dismiss with prejudice, that ultimate acknowledgment, I guess I don't really know where I got this. Is that correct? I believe that's, again, one of the many things that ultimately bothered the court here, but certainly one of the central ones and a reason that provides the ample basis for this court to affirm Judge Kelly's exercise of her discretion. Thank you, Your Honors. Thank you. At this time, would Attorney Morrison please reintroduce himself on the record to begin? He has a five-minute rebuttal. Ross Morrison for appellants. Let me just go right to the heart of the issue, as I think now has been made clear. The issue is whether, what test did the relators need to satisfy? Was it a subjective one in which they had to show, actually trace the source of where they got the head diameter, which is the only relevant information? Why do you keep saying that? Because that's what the court found. What's the relevance of the range in your view? The range is relevant to calculate the defects, but that can be determined from the diameter. The expert was able to calculate that. Okay. If the district court or the magistrate judge here was of the view that she was not satisfied, that it had been shown that the range could be calculated from the diameter, what then, in your view? Well, I don't think the district court discussed anything other than the diameter. I understand that. Just, I'm asking, if the magistrate judge was of the view that the source of dissatisfaction was an inability to explain how the range was derived, what then? I believe the documents, the exhibits that I referred to would still be sufficient to derive that range, if, in fact, it was part of the subject information. And that's based on the fact that there's a document that has that precise range? I believe, yes, I believe the- The precise range? I believe is either contains it or it can be derived from, ascertained from the document. Which counts according to the district court. I understand. I just want to be clear, though. I hear you now saying, with respect to the range, which you may be saying doesn't matter, but with respect to the range, there is nothing in any public document that shows the range with the precision that at least your opponent is saying the magistrate judge was trying to see, if you could explain. That's nowhere in the magistrate judge's opinion. But I think you'd have to calculate it based on the documents I referred to. But the issue, the subject information, which was the diameter, it's one number. Excuse me, counsel. I'm looking at a statement of the court. It's concerned with both the head diameter and tolerance level. So I thought when the court refers to tolerance levels, we're referring to these other numbers that Judge Barron is talking about. Isn't that correct? Tolerance levels, yes. But, again, that can be calculated. So you keep saying it's just the head diameters, but the district court. That was the focus of the litigation in the court and the court's opinion. So I would think that the head diameter, everything stems from the diameter of the head. Okay. But now it's just a difference between the number and a derivation from that number of a different number. In terms of the head diameter? In terms of the tolerance levels. That's not the head diameter. Correct. So either it's in some other public document to the degree of precision or it's derived from the head number. Right. I think that the latter is correct. Okay. As I understand Judge Kelly's opinion, she was not impressed by the attempt to show it could be derived from the head number. What do you have to say about that? The way I read the opinion was that if they had shown a public source of diameter, that we would not cut today. If we read the opinion differently, does that mean you lose? No. Okay. So how could you win if we read the opinion in which Judge Kelly's concern was that the head number alone did not equate to the tolerance level and that she wanted to see how one could derive the tolerance level to the requisite degree of precision just from the head number? Sure. I think the evidence, the issue that we're talking about, and why I keep talking about the head diameter, because that dimension or any derivation of that dimension or another to millimeters, that was the information that was provided to the expert. So that's why that's the information that's at issue. That was the allegedly confirmation. Isn't the problem that the, I think, opposing counsel indicated that these tolerance levels were disclosed on the diagrams that were subject to the protective order? And so, I mean, the court, unable to, confronted with the inability of your clients to explain how they derived those very precise tolerance levels, drew the inference. They came from this diagram which was still, this engineering drawing that was still subject to the protective order. Isn't that the problem? The record evidence is as to what the relators provided to their expert, which then became the basis for the expert report, which is the basis for the allegation to amend the complaint, was the diagram. I'm sorry. Was the head diameter. That's the information they provided to the expert. That's why I keep saying it's the information that's at issue in this case. The experts then used that information to derive the tolerances. Okay. Thank you. Thank you, counsel. That concludes the argument.